UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>BENJAMIN GRABINSKI,<br><br>Defendant. | Case No. 22-cr-00221 (RJL) |

### GOVERNMENT'S OPPOSITION TO
### DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Mr. Grabinski moves to suppress certain statements he made to law enforcement because he did not receive *Miranda* warnings or because those statements were not voluntary. But Mr. Grabinski's statements were not the result of custodial interrogation and therefore do not implicate *Miranda*. Moreover, his statements were voluntary as they were not the result of law enforcement questioning let alone the type of egregious police coercion required for a finding of involuntariness. For the following reasons, Mr. Grabinski's admissions concerning his throwing of a Molotov cocktail into the Chinese embassy are admissible and his motion should be denied.

### BACKGROUND[1]

On May 29, 2022, at approximately 1:00 AM, Benjamin Grabinski went to Embassy of the People's Republic of China (the "Embassy"). He approached the gate of the Embassy and a special police officer (SPO) stationed there advised him not to walk behind the SPO's vehicle. Mr. Grabinski asked the SPO why he was there, and the SPO informed him that he was working security. Mr. Grabinski responding by shouting: "I think you should leave now." Less than an

---

[1] The Government intends on proving the following facts at trial or in any evidentiary hearing in this matter.

1

hour later, Mr. Grabinski returned to the Embassy. He was wearing the same clothes and carrying the same backpack as he had been earlier. As Mr. Grabinski approached the Embassy he crouched low to the ground and kept his right hand behind his back. Mr. Grabinski then threw a large object toward the Embassy. The SPO could not tell what the object was but he could hear that it made a significant impact. Mr. Grabinski then yelled: "Next time, it's going to be a firebomb," before leaving the area. The SPO looked through the Embassy gate and observed some rocks in the general area where he had seen Mr. Grabinski throw the object. Officers from the U.S. Secret Service responded to investigate and interviewed the SPO who provided a description of Mr. Grabinski.

At 1:55 AM, two Secret Service officers encountered Mr. Grabinski at the corner of Connecticut Avenue and Van Ness Street NW, approximately a five-minute walk from the Embassy. He matched the description that officers had received earlier. The Secret Service officers stopped Mr. Grabinski and identified him with his driver's license and Veteran Affairs card. While stopped, Grabinski stated that he traveled from Chicago to Washington, D.C. to express his discontent for the Chinese government. He further stated that he had thrown "a small rock," at the Embassy. His statements were not in response to any questions asked by the officers but instead were made spontaneously. A Secret Service officer took a photograph of Mr. Grabinski and showed it to the SPO who had been stationed outside the Embassy. The SPO identified Mr. Grabinski as the man who threw a rock at the Embassy, first using the photograph and then in person shortly afterwards. After several unsuccessful attempts were made to contact the Embassy, Mr. Grabinski was allowed to leave.

On June 9, 2022, shortly after 7:00 AM, Mr. Grabinski returned to the Embassy. He approached the Embassy carrying a Molotov cocktail. Specifically, he was carrying a glass

2

bottle filled with an accelerant and with a cloth extending from the neck of the bottle. He attempted multiple times to light the Molotov cocktail with a cigarette lighter but was unable to do so. He then threw the Molotov cocktail over the Embassy gate and into the Embassy. The device shattered in the courtyard without igniting. An SPO on scene witnessed Mr. Grabinski throwing the device and reported to U.S. Secret Service, providing a lookout for Mr. Grabinski. At 7:07:28 AM, U.S. Secret Service broadcast the following lookout: "white male headed towards Van Ness down Connecticut Avenue." Less than forty seconds later, a U.S. Secret Service officer broadcast "it looks like he's right there at the corner of Van Ness and Connecticut Avenue."

At 7:08 AM, U.S. Secret Service Sergeant Joshua Mas observed and stopped Mr. Grabinski at the intersection of Van Ness Street and Connecticut Avenue NW. He handcuffed Mr. Grabinski to await backup. At the time, Sergeant Mas was equipped with a handheld radio rather than an earpiece. The handheld radio was audibly broadcasting as other U.S. Secret Service officers responded to the Embassy and were describing the remnants of the device that had been thrown into the Embassy. Mr. Grabinski heard these observations over the radio and responded: "I tried to light it, but it didn't work, so I just threw it." Mr. Grabinski was arrested.

On June 17, 2022, Mr. Grabinski was indicted for Damage to Property Used by Foreign Governments, in violation of 18 U.S.C. § 970(a) and Arson, in violation of 18 U.S.C. § 844(i). On December 6, 2023, the defendant filed a motion to suppress his statements, arguing that his statements were obtained in violation of *Miranda* or were involuntary. *See* ECF No. 34.

## LEGAL STANDARD

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. To safeguard that right, police must

warn a suspect who is going to be questioned while in custody that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

The requirements of *Miranda* only apply, however, when a defendant is (1) in custody and (2) subject to interrogation by law enforcement. *United States v. Vinton*, 594 F.3d 14, 26–27 (D.C. Cir. 2010) ("*Miranda* warnings are required "where a suspect in custody is subjected to interrogation.")

A defendant is in custody when he is under arrest or subject to restraint of his movement of the same degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983). In determining whether a defendant is in custody, courts look at the totality of the circumstances including "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012).

A defendant is subject to interrogation when he is expressly questioned by law enforcement or subject to its functional equivalent. *See Rhode Island v. Innis,* 446 U.S. 291, 300–01 (1980). Interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. Interrogation does not include statements or actions by law enforcement which do not invite or suggest a response from a defendant. *Id.* at 300–02 (concluding that there was no 'interrogation' when two officers were talking to each other "to which no response from the respondent was invited."). "Volunteered

4

statements of any kind are not barred by the Fifth Amendment" and "any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda*, 384 U.S. at 478.

Beyond the requirements of *Miranda*, a defendant's statements must be voluntary to be admissible. That is, a statement must be the product of a defendant's free will. *See Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Voluntariness turns on whether the "defendant's will was overborne" when he gave his statement, *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973), and the test for this is whether the statement was a "product of an essentially free and unconstrained choice by its maker." *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 522. *Mincey v. Arizona* is the paradigmatic case of police coercion rendering a defendant's statements involuntary. 437 U.S. 385, 398–99 (1978). There, law enforcement interrogated a defendant who "was seriously wounded," "depressed almost to the point of coma," in "unbearable" pain, "was evidently confused and unable to think clearly about. . . events . . . or the circumstances of his interrogation," and was interrogated while "he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus." *Id.* For a court to find that statements were involuntary, the facts must be "egregious." *United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012).

## ARGUMENT

The Government intends on admitting the following statements by Mr. Grabinski during its case-in chief:

1. May 29, 2022: Prior to throwing a rock at the Embassy, Mr. Grabinski asked a special police officer why the officer was at the Embassy and then shouted: "I

>think you should leave now."

2. May 29, 2022: After throwing a rock at the Embassy, Mr. Grabinski shouted: "Next time, it's going to be a firebomb!"

3. May 29, 2022: After throwing the rock, Mr. Grabinski was stopped by law enforcement on the street while Secret Service attempted to contact the Embassy. While stopped he identified himself by name and explained to officers that he traveled to Washington, D.C. from Chicago to express his discontent with the Chinese government and that he had thrown a small rock at the embassy. Mr. Grabinski was released shortly after without being taken into custody.

4. June 9, 2022: After throwing a Molotov cocktail at the Embassy, Mr. Grabinski was stopped and in response to hearing Secret Service officers discuss his conduct over the radio, Mr. Grabinski stated: "I tried to light it, but it didn't work, so I just threw it."

All of these statements are admissible.[2] The first two statements do not implicate *Miranda* as Mr. Grabinski was not in custody and the statements, which were shouted at a special police officer while on a public street, were not the result of police interrogation. Similarly, while Mr. Grabinski was stopped and handcuffed when he made the third and fourth statements, he was not in custody within the meaning of *Miranda* and his statements were spontaneous and not the result of police interrogation. And all four statements were voluntary as they were not the result of extreme police coercion.

I.   **Mr. Grabinski's May 29, 2022 Statements to the SPO Outside the Embassy Do Not Implicate *Miranda*.**

Mr. Grabinski's May 29 statements, shouted at an SPO who was posted outside of the Embassy, simply do not implicate the protections of *Miranda*.

As an initial matter, it is not clear that the SPO posted outside the Embassy would even constitute law enforcement for the purposes of *Miranda*. *Miranda* defined the term interrogation

---

[2] Mr. Grabinski's motion only focuses on the fourth of these statements. To avoid the need for additional briefing, the Government addresses all four statements.

6

as "questioning initiated by law enforcement officers." 384 U.S. at 444. This makes sense because "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is *governmental* coercion," not coercion by private parties or influences. *Connelly*, 479 U.S. at 170. While interrogation can include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect," *Innis*, 446 U.S. at 301 (internal footnotes omitted), it simply does not apply to wholly private conduct. *See Connelly*, 479 U.S. at 170 ("*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that.")

But even if this SPO were to be considered a member of law enforcement, Mr. Grabinski was indisputably not subject to custodial interrogation. The SPO never detained or even attempted to detain Mr. Grabinski. When Mr. Grabinski made these statements, he remained at all times free to leave. Indeed, Mr. Grabinski left: not once, but twice. Moreover, Mr. Grabinski was never subject to interrogation by the SPO. The SPO did nothing to coerce let alone invite Mr. Grabinski to shout at him. The first statement—"I think you should leave now"—followed the SPO simply stating the reason that the SPO was posted in that location. The second statement— "Next time, it's going to be a firebomb!"—did not follow any statement by the SPO at all.

"Volunteered and spontaneous statements made without *Miranda* warnings are admissible if they were not made in response to police questioning." *United States v. Williamson*, 181 F. Supp. 3d 41, 43 (D.D.C. 2014). Mr. Grabinski's voluntary statements made in earshot of the SPO do not implicate *Miranda* and therefore are admissible.

II.    **Mr. Grabinski's Statements to Secret Service Officers on May 29, 2022 Were Not the Subject of Custodial Interrogation.**

Mr. Grabinski's May 29 statements to Secret Service officers while he was stopped on a public street also were not the result of custodial interrogation.

*First*, Mr. Grabinski was not in custody when he made these statements. After Mr. Grabinski threw a rock at the Embassy, he was detained by Secret Service officers while they attempted to confirm that he had thrown the rock and also determine whether the Embassy wanted to participate in any prosecution of Mr. Grabinski. Mr. Grabinski was stopped at the intersection of Van Ness Street NW and Connecticut Avenue NW where he was handcuffed. That intersection is a busy and well-trafficked area immediately next to two university campuses (UDC and Howard University) with bars, restaurants, and a Metro station all within eyeshot. Even at that early hour, there were other people in the area, cars driving by, and streetlamps lighting the area. Mr. Grabinski remained on the public street for approximately one hour during which Secret Service took a picture of him, confirmed his identity with the SPO who had observed the rock throwing, and made several attempts to contact the Embassy. Secret Service never drew or pointed their weapons at Mr. Grabinski. And Mr. Grabinski was ultimately released without ever being transported to a detention facility or otherwise being placed in what a reasonable person would consider custody. That is, he was not locked in a police vehicle or placed in an interrogation room. Under these facts, he was not in custody. *See United States v. Walters*, 563 F. Supp. 2d 45, 51 (D.D.C. 2008), *aff'd in part,* 361 F. App'x 153 (D.C. Cir. 2009) (finding that a defendant was not in custody when officers temporarily restrained a defendant's hands because "officers never unholstered or displayed their weapons, and the setting was no more coercive than a typical traffic stop.") At best this was akin to a *Terry* or traffic stop, neither of which constitutes a custodial stop under *Miranda*. *See United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995) (concluding

that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes.")

Even if Mr. Grabinski was in custody, his statements were not the result of interrogation by law enforcement. The Secret Service officers did not question or accuse Mr. Grabinski of anything. Instead, he spontaneously offered these statements apparently to explain his motivations and conduct. Spontaneous statements that are not the product of law enforcement questions are admissible without regard to *Miranda* warnings. *See United States v. Samuels*, 938 F.2d 210, 214 (D.C. Cir. 1991) (finding that where a defendant "volunteered the statement without prompting from the police," his "[s]pontaneous statements [we]re admissible without *Miranda* warnings.")

### III.  Mr. Grabinski's Statements to Secret Service Officers on June 6, 2022 Were Not the Result of Custodial Interrogation.

As with his statements on May 29, Mr. Grabinski's statements to Secret Service officers on June 6 were not the result of custodial interrogation.

Mr. Grabinski was not in custody at the time he made these statements to Secret Service. Eight days after he was briefly detained and then released by Secret Service on May 29, 2022, Mr. Grabinski was once again detained by Secret Service on June 6, 2022. He was stopped in the same area as before: the well-trafficked intersection of Van Ness and Connecticut Avenue NW, adjacent to a metro and two universities. Unlike on May 29, 2022, it was broad daylight. Multiple people were traveling through the area on foot and by car.[3] Mr. Grabinski was once again handcuffed. But Mr. Grabinski knew that simply because he was handcuffed it did not mean that he was under arrest. Just eight days earlier he had been briefly handcuffed in the same intersection by the same

---

[3] The intersection was ultimately closed to traffic to allow Secret Service to ensure the absence of any additional explosive devices.

9

agency and was released after approximately an hour.  Mr. Grabinski made these statements prior to being placed in a vehicle or in an interrogation room.  And once again the Secret Service officers did not draw or point their weapons at Mr. Grabinski.  Under these facts, Mr. Grabinski was not in custody.

Even if Mr. Grabinski was in custody, his statements were voluntary and not in response to any police questioning.  Mr. Grabinski overheard law enforcement officers on a radio channel discussing his crime.  Mr. Grabinski took that opportunity to explain himself.  As he heard officers discussing the device he had thrown, he chimed in: "I tried to light it, but it didn't work, so I just threw it."  The Secret Service officer who was reporting his observations on the radio could not have intended those observations to lead Mr. Grabinski to confess to this crime.  In fact, that officer likely had no idea that Mr. Grabinski would even be able to hear his observations.  Nor did the officer detaining Mr. Grabinski intend for the radio broadcast to lead Mr. Grabinski to confess.  The officer detaining Mr. Grabinski could not control what other officers would say into the radio.  And the officer had no way to listen to the radio without Mr. Grabinski also hearing the radio.  Because "the police surely cannot be held accountable for the unforeseeable results of their words or actions," *Innis*, 446 U.S. at 301–02, Mr. Grabinski's spontaneous statements are admissible.

IV.     **All of Mr. Grabinski's Statements Were Voluntary.**

Beyond *Miranda*, all of Mr. Grabinski's statements were voluntary because they were not the result of police coercion.  For a court to find that statements were involuntary, the facts must be "egregious."  *United States v. Mohammed*, 693 F.3d 192, 198 (D.C. Cir. 2012).   And these facts must be based on active coercion by law enforcement.  *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'")  The facts here are not in the same universe as the cases finding

10

involuntariness.  Mr. Grabinski was neither in custody nor subject to hours of interrogation by law enforcement.  *See Mohammed*, 693 F.3d at 196 (finding statements to be voluntary where a defendant was arrested in Afghanistan, blindfolded and handcuffed, held in a detention cell, and then questioned for two hours without a blindfold).  Mr. Grabinski was not threatened expressly or even implicitly.  *See Berghuis v. Thompkins*, 560 U.S. 370, 386–87 (2010) (finding statements to be voluntary where a defendant was interrogated for three hours and law enforcement referenced his religious beliefs).  Mr. Grabinski's brief handcuffed detention where he was not subject to police questioning on a public street in view of members of the public cannot constitute the type of police coercion necessary for a finding of involuntariness.

Tellingly, Mr. Grabinski does not specifically identify any law enforcement coercion rendering his statements involuntary.  Instead, he points to factors internal to Mr. Grabinski:  his military background and his history of mental health issues.  ECF No. 34 at 3.  But these types of arguments are foreclosed by precedent.  In *Colorado v. Connelly*, the Supreme Court overturned the Supreme Court of Colorado's determination that introducing a defendant's statement where the defendant was suffering from mental illness at the time the statement was made violated the Due Process Clause of the Fourteenth Amendment.  479 U.S. at 159.  The Supreme Court found that the voluntariness doctrine, "focused upon the crucial element of police overreaching." *Id.* at 163.  That is, of the cases finding involuntariness "all have contained a substantial element of coercive police conduct." *Id.* at 164.  "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.*  Therefore, "a defendant's mental condition, by itself and apart from its relation to official coercion," does not "dispose of the inquiry into constitutional 'voluntariness.'" *Id.*  As the Court reasoned, to hold differently would impose "a far-ranging requirement that courts

11

must divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision." *Id.* at 165–66.

This precedent forecloses any inquiry into Mr. Grabinski's state of mind at the time he made these statements. Instead, this court should look to law enforcement's conduct: briefly detaining Mr. Grabinski on a public street, never drawing their firearms or otherwise threatening Mr. Grabinski, and not even questioning him about this offense. In the absence of any law enforcement coercion, Mr. Grabinski's statements were voluntary and are admissible.[4]

## CONCLUSION

For all of the foregoing reasons, the Mr. Grabinski's motion to suppress should be denied and his statements should be admitted at trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Cameron A. Tepfer*
Cameron A. Tepfer
D.C. Bar No. 1660476
Assistant United States Attorney
United States Attorney's Office
601 D. Street, NW
Washington, DC 20579

---

[4] Beyond the four statements referenced in this motion, the Government reserves the right to introduce additional statements by Mr. Grabinski should he choose to testify at trial. Specifically, Mr. Grabinski sent the Government a letter on October 19, 2023 in which he referenced his motivations for committing this offense. The Government provided this letter to defense counsel immediately upon receiving it.